FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 AUG 12 P 4: 12

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CLODILE ROMERO. JR., Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | **CIVIL ACTION NO.** _____ |
| vs. ) ) ) | **04-2312** |
| US UNWIRED, INC., WILLIAM L. HENNING JR.,) ROBERT W. PIPER and JERRY E. VAUGHN, ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| Defendants. ) | **JURY TRIAL DEMANDED** |

**SECT. S MAG. 5**

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding US Unwired, Inc. ("US Unwired" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Fee___150.___
Process___caa(4)bus
X  Dktd___caa___
___ CtRmDep_____
___ Doc. No.___1___

1

## NATURE OF THE ACTION

1.       This is a federal class action on behalf of purchasers of the common stock of US Unwired, Inc. between May 23, 2000 and August 13, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.       The claims asserted herein arise under and pursuant to Sections 10(b), 11, 15 and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.       This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.       Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, the Company maintains its principal executive offices in this Judicial District.

5.       In connection with the acts, conduct and other wrongs alleged in this complaint, defendants. directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

6.       Plaintiff Clodile Romero, Jr. purchased US Unwired securities, as set forth in the accompanying certification attached hereto and incorporated herein by reference, and have suffered damages as a result of the wrongful acts of defendants as alleged herein.

7.     Defendant US Unwired is a Louisiana corporation with its principal executive offices located at 901 Lakeshore Drive, Lake Charles, Louisiana 70601. US Unwired's services include Sprint PCS wireless phone service. The Company signed an affiliation agreement with Sprint PCS in 1998 and has since become one of the largest PCS affiliates of Sprint, serving over 500,000 customers. The Company's Sprint PCS service territory includes more than 17.6 million people.

8.     Defendant William L. Henning Jr. ("Henning") is the current Chairman of the Board of Directors. From 1988 to 2000, defendant Henning was the Company's Chief Executive Officer.

9.     Defendant Robert W. Piper ("Piper") has been President of the Company since 1995 and was named Chief Executive Officer in 2000. Defendant Piper had served as Chief Operating Officer from 1995 to 2000.

10.     Defendant Jerry E. Vaughn ("Vaughn") has served as the Company's Chief Financial Officer since June 7, 1999.

11.     Defendants Henning, Piper, and Vaughn are referred to herein as the "Individual Defendants."

12.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors

meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of US Unwired, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon

truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with US Unwired, each of the Individual Defendants had access to the adverse undisclosed information about US Unwired's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about US Unwired and its business issued or adopted by the Company materially false and misleading.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of US Unwired common stock by disseminating materially false and misleading statements and/or concealing material adverse

5

facts. The scheme: (i) deceived the investing public regarding US Unwired's business, operations, management and the intrinsic value of US Unwired common stock; and (ii) caused Plaintiff and other members of the Class to purchase US Unwired common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of US Unwired between May 23, 2000 and August 13, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, US Unwired common shares were actively traded on the NASDAQ, under the ticker symbol ("UNWR"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by US Unwired or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Upon information and belief, Plaintiff avers that there are at least thousands of class members who acquired US Unwired common stock during the Class Period.

6

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants violated the Exchange Act;

(c)     Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(d)     Whether Defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(e)     Whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

(f)     Whether the Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(g)     Whether the market prices of the US Unwired's securities during the Class Period were artificially inflated due to material non-disclosures and/or misrepresentations complained of herein; and

(h)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

25.     Defendant US Unwired, holds direct or indirect ownership interests in five Sprint PCS affiliates: Louisiana Unwired, Texas Unwired, Georgia PCS, IWO Holdings and Gulf Coast Wireless.  Through Louisiana Unwired, Texas Unwired, Georgia PCS and IWO Holdings, US Unwired is authorized to build, operate, and manage wireless mobility communications network products and services under the Sprint brand name in 67 markets, which currently serving over 500,000 PCS customers.  US Unwired's PCS territory includes portions of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Oklahoma, Tennessee, Texas, Massachusetts, New Hampshire, New York, Pennsylvania, and Vermont.  In addition, US Unwired provides cellular and paging service in southwest Louisiana.

26.     On April 4, 2000, the Company filed a registration statement on Form S-1 (file No. 333-33964) with the SEC for the sale to the public of 8,000,000 shares of its class A common stock ("Initial Public Offering" or "IPO").  The registration statement became effective on May 17, 2000, and 8,000,000 shares were issued on May 23, 2000, the first day of the Class Period, at the price of $11.00 per share before the underwriting discount.  The underwriters had

8

the option to purchase up to an additional 1.2 million shares from selling stockholders at the same price of $11.00 per share before the underwriting discount. This registration statement was signed by defendants Piper, Henning, and Vaughn.

27.    Subsequently, the underwriters exercised a portion of their "over allotment option" and, on September 12, 2000, purchased 236,700 shares. The Company received net proceeds of $80.6 million after an underwriting discount of $6.2 million and expenses of $1.2 million.

28.    According to the registration statements filed with the SEC on April 14, 2000, the expected proceeds from this offering were to be used to accelerate the construction of the Company's PCS network and for other general corporate purposes.    In these filings, the Company defined its relationship with Sprint PCS as follows:

> Our Affiliation with Sprint PCS
>
> Under our agreements with Sprint PCS, we market Sprint PCS products and services in our service area using licenses that Sprint PCS acquired from the FCC in 1994 and 1996. We will be the only provider of Sprint PCS products and services in our service area. Some key points about these agreements are:
>
> – each agreement lasts 50 years with an initial period of 20 years and three automatic, successive 10-year renewal periods.
> – each agreement requires revenue sharing of 8% to Sprint PCS and 92% to US Unwired, except that US Unwired retains 100% of revenues from non-US Unwired Sprint PCS customers traveling in our service area, extraordinary income and equipment sales.
> – if we terminate or breach the agreements, we may be required to sell our PCS business and network to Sprint PCS or to purchase the Sprint PCS licenses from Sprint PCS.
> – if Sprint PCS terminates or breaches the agreements, we may be able to sell our PCS business and network to Sprint PCS or to purchase the Sprint PCS licenses from Sprint PCS.
>
> We believe that our service area is important to Sprint PCS's plan to expand its PCS network. To date, Sprint PCS has made considerable investments in the licenses covering our service area.

>       We estimate that Sprint PCS paid over $100 million to acquire the
>       PCS licenses in our service area and to prepare the licensed
>       markets for service.

The Company also provided the following warnings regarding its customer base:

>       Our PCS business may suffer because more subscribers generally
>       disconnect their service in the PCS industry than in the cellular
>       industry.
>
>       The PCS industry has experienced a higher rate of subscribers who
>       disconnect their service than the cellular industry. This rate, or
>       churn, of PCS subscribers may be the result of limited network
>       coverage, unreliable performance of calls, costs, customer care or
>       other competitive factors.
>
>       We plan to keep our PCS subscriber churn down by expanding
>       network coverage, improving network reliability, marketing
>       affordable plans and enhancing customer care. We cannot assure
>       you that these strategies will be successful. A high rate of PCS
>       subscriber churn could harm our competitive position and the
>       results of operations of our PCS services.

29.     On August 9, 2000, the Company issued a press release announcing record second quarter revenues for the period ended June 30, 2000.  The Company reported that second quarter revenues were $25.6 million.  This represented a 77% increase over the second quarter 1999. Total wireless subscribers had reached 132,000, up 62% over the second quarter of 1999.  PCS subscribers had grown to 77,000 and generated $15.9 million in revenue for the quarter. Defendant Piper, commenting on the results, stated: "We had a very productive second quarter. Operationally, we launched Sprint PCS service in nine new markets and added 109 cell sites to the network. Our sales team brought 11,000 new PCS subscribers onto the system. Financially, we executed a successful public offering during a very difficult market."

30.     On August 11, 2000, US Unwired filed with the SEC its Form 10-Q for the period ended June 30, 2000.  In the Form 10-Q, US Unwired repeated the financial results

reported in the August 9, 2000 press release detailed above.  The Form 10-Q was signed by defendant Vaughn.

31.     All this good news had a positive impact on US Unwired's reputation within the financial community.   Jennifer A. Murtaugh ("Murtaugh") an analyst with First Union Securities, Inc. reiterated a "Strong Buy" recommendation in her August 10, 2000 report on US Unwired.  This report was published shortly after the Company filed its second quarter 2000 earnings results with the SEC.  Murtaugh appeared particularly persuaded by "the strong net additions and continued network deployment."

32.     On November 9, 2000, US Unwired issued a press release announcing record third quarter revenues for the period ended September 30, 2000.  For the third quarter, the Company reported record revenue of $29.3 million.  This represented a 100% increase over third quarter 1999 revenues.  The Company ended the third quarter with 144,000 customers, up 72% over the third quarter of 1999.  PCS subscribers had grown to 91,000 and generated $20.2 million in total revenue for the quarter, a 27% increase over the second quarter of 2000. Defendant Piper, commenting on the results, stated in pertinent part:

> The seasonality of the third quarter usually makes it the most challenging of the year for US Unwired, but we executed our business plan and exceeded analysts' expectations for the period. We launched Sprint's all-digital, all PCS service in eight new markets, added 145 cell sites to our network and brought 14,500 new Sprint PCS subscribers onto the system. We also laid the foundation for a strong holiday selling season by more than doubling our points of sale.

33.     On November 13, 2000, US Unwired filed with the SEC its Form 10-Q for the period ended September 30, 2000.  In the Form 10-Q, US Unwired repeated the financial results reported in the November 9, 2000 press release detailed above.  The 10-Q was signed by defendant Vaughn.

34.    A review of calendar year 2000 demonstrates how the Company "set the table" for 2001. Fresh off its IPO, the Company quickly attributed its expanding customer base to its affiliation with Sprint PCS.   Meanwhile, insiders were preparing to sell off thousands of shares reaping millions of dollars in profits.  (See Insider Trading Chart, attached hereto as Exhibit "A.")

35.    On January 2, 2001, US Unwired announced in a press release that the Company had sold 127 of its towers to SBA Communications Corporation, for gross proceeds of approximately $40 million. Commenting on this announcement, defendant Piper stated:

> The strong level of interest we have received in our tower portfolio serves as an important indicator as to the attractiveness and strategic importance of our service territory. The sale of our tower assets provides us with $40 million in additional cash, further enhancing the liquidity of our already fully-funded balance sheet in a time of difficult capital market conditions.

36.    On January 17, 2001, US Unwired issued a press release with the headline "Strong Fourth Quarter 2000 Subscriber Growth and the Launch of Its Services in Eight Markets." Therein, the Company reported strong subscriber growth.  During the fourth quarter, the Company added 34, 909 new PSC subscribers, which accounted for a surge in its subscriber base to 126,006.  US Unwired further reported that blended customer churn was 3.0 percent, while churn for the post-pay customers was 1.8 percent.   With respect to US Unwired's expansion efforts, the Company announced that it recently launched advanced Sprint PCS services (PCS) in eight markets: Columbus, Greenville, Hattiesburg, Laurel, McComb, and Tupelo, Mississippi and Florence and Gadsden, Alabama. As a result, US Unwired now offered Sprint PCS Products and Services to 740,000 residents in those areas.  Including these new markets, US Unwired serves 36 markets covering a population of approximately 6.0 million.

Commenting on the Company's expansion efforts, defendant Piper stated: "US Unwired employees did a fantastic job in continuing to accelerate the expansion of our customer base, [and] [w]e began preparations for the holiday season early in the third quarter when we doubled our distribution points. We also supplemented our sales efforts by launching markets between New Orleans and Atlanta via Interstates 59 and 20, providing coverage of Sprint's all-digital, all PCS wireless service."

37.     On February 22, 2001, US Unwired issued a press release announcing record revenue of $35.9 million for the fourth quarter, period ended December 31, 2000.   This represented a 22% increase over third quarter 2000 revenues.   For the fiscal year 2000, US Unwired's revenues were $113.1 million, a 93% increase over the prior year.   In the press release, the Company attributed the results to its relationship with Sprint PCS:

> The company's growth was led by its PCS operations, which accounted for 67%, or $76.2 million, of its annual revenues. PCS subscribers grew by 35,000 to a total of 126,000 and generated $27.4 million in total revenue for the quarter, a 36% increase over the third quarter of 2000. PCS subscriber revenue was $15.2 million for the fourth quarter of 2000, up 27% from the previous quarter; and was $45.1 million for the full year, representing an increase of 337% over 1999.
>
> ***
>
> During 2000, US Unwired initiated Sprint PCS service in 26 markets with a total population of 6.7 million. The company currently serves 36 markets with a population of 9.3 million while its network covers approximately 6.0 million residents. As of December 31, 2000, US Unwired marketed its services through 27 company stores and more than 760 national outlets, regional retailers and local agents.

Obviously pleased with the announced results, defendant Piper stated: "During 2000, we exceeded all the growth components of our business model. Our increases in subscribers and revenues were well above expectations. We added 495 cell sites and two switches to our PCS

network, bringing Sprint PCS service to an additional 3.9 million people on schedule and on budget. We also completed two major financial transactions that raised $127.8 million in cash."

38.     On April 2, 2001, US Unwired filed with the SEC its Form 10-K Annual Report for 2000.  The Form 10-K was signed by defendants Piper, Vaughn, and Henning and reiterated the financial results previously distributed by the Company.

39.     On May 7, 2001, US Unwired issued a press release announcing record quarterly PCS net subscriber additions of 46,423, topping the net PCS additions posted in the fourth quarter of 2000 by 33%.  The Company's total wireless subscribers base had grown to over 219,000 by March 31, 2001.  The Company also reported 2001 first quarter record revenue of $47.9 million.  This represented a 33% increase over fourth quarter 2000 revenues.  Overall PCS subscribers had grown to 172,429 and generated $39.5 million in total revenue for the quarter, this represented a 44% increase over the prior quarter.  Defendant Piper stated the following:

We were pleased with our performance during the first quarter as we improved on fourth quarter 2000's net PCS additions by over 11,500. In addition, we reduced our monthly PCS churn rate and improved all per-subscriber PCS revenue metrics. We also reinforced the Sprint PCS presence in our markets as we opened four new Sprint PCS stores in our service territory.

40.     Just over three weeks later, on May 24, 2001, US Unwired announced, via a press release, that defendant Henning, together with other members of the Henning family, had initiated a structured diversification plan to sell a limited portion of their US Unwired stock holdings at specified prices and over a one-year period.  According to the press release, the plans adopted under the new SEC rule 10b5-1 were designed to:

Avoid any real or perceived conflicts of interest that might arise from their involvement with the company, while enabling these founding family members to diversify their respective holdings and

to pay certain taxes that have become due as a result of estate planning activities.

The plans, which provide for daily sales subject to specified daily volume limits and price requirements, will help to avoid a bunching of sales during US Unwired's "trading window" periods following quarterly announcements of US Unwired earnings.

Defendant Henning went on to say:

These sales plans represent a diversification and liquidity step for certain Henning family members. The value of our retained US Unwired shares will continue to represent a substantial portion of the Henning family's personal net worth, reflecting our continued confidence in the success of and prospects for US Unwired.

41.     On August 8, 2001, US Unwired announced, in a press release, another quarter of record growth capped by the Company achievement of positive earnings before interest, taxes, depreciation, amortization and non-cash compensation ("EBITDA"). Revenues for the quarter ended on June 30, 2001, had increased to $58.7 million. This represented a sequential increase of 23% over the first quarter of 2001, and a 129% gain over the second quarter 2000. Defendant Piper commenting on the results, stated: "Reaching the EBITDA-positive mark ahead of expectations is an extraordinary accomplishment. Our outstanding operational performance and adherence to the sound fundamentals of our business plan over the last two years positioned us for the early achievement of positive EBITDA." Moreover, defendant Piper added:  "Our network is judged by our customers every day and is the key to our operational success. Over the next 18 months, we plan to expand our network to cover an additional one million residents, bringing our coverage up to approximately 75%."

The Company further reported:

US Unwired's rapid increase in its PCS subscriber base as well as its commitment to decreasing customer acquisition costs also significantly impacted its achieving EBITDA profitability. In the second quarter of 2001, PCS subscribers grew by 28,430 to

200,859, doubling the customer base in just 215 days. Subscriber acquisition costs remained below $350 for the second consecutive quarter, falling to $340 from $348 in the first quarter. Total wireless subscribers topped 241,500.

Defendant Piper also noted:

> An important measure of customer satisfaction with the company's Sprint PCS products is monthly average minutes of use, which was 544 per average PCS subscriber with roaming and 402 without roaming for the quarter. Total PCS system minutes of use grew to approximately 304.6 million for the quarter, including 79.7 million roaming minutes. PCS churn, net of 30-day returns, was approximately 3.0% for the second quarter of 2001.

42.     Also on August 8, 2001, US Unwired filed with the SEC its Form 10-Q for the period ended June 30, 2001. The Form 10-Q was signed by defendant Vaughn. In this filing, US Unwired reiterated the financial results reported in the August, 8 2001 press release detailed above.

43.     On November 8, 2001, US Unwired announced in a press release its financial results for the third quarter, period ended September 30, 2001. According to the press release, this was the Company's twelfth quarter of record revenue and its second consecutive quarter of positive EBITDA. The press release stated in part:

> The company generated $1.4 million in EBITDA, excluding non-cash stock compensation expense during the third quarter, up from $1.1 million a quarter ago and a negative $5.0 million for the third quarter of 2000. In the third quarter of 2001, PCS subscribers grew by 35,107 to 235,966 and total wireless subscribers were 273,044.

Defendant Piper commented as follows:

> Our continued focus on operations was an important element in re-affirming our status as an EBITDA-positive company during the third quarter. Despite higher than expected sales and higher than normal operating costs associated with our conversion to Sprint PCS' customer care and billing systems, our EBITDA increased.

16

> We were determined to retain our status as the profitability leader among our peer group and did so through proactive cost management and in-depth planning."

The press release went on to say:

> The Company's commitment to cost containment was also demonstrated in its low cost per gross subscriber addition. PCS subscriber acquisition cost was below $350 for the third consecutive quarter, remaining at $340, the same amount reported in the second quarter and down from $348 in the first quarter. As the result of cost-conscious efforts, PCS pre-marketing cash flow exceeded $19 million or approximately $29 per average subscriber. Cash cost per subscriber remained low at $60 per subscriber.

44.     On November 9, 2001, US Unwired filed with the SEC its Form 10-Q for the period ended September 30, 2001.  The Form 10-Q was signed by defendant Vaughn.  In this filing, US Unwired reiterated the financial results reported in the November 8, 2001 press release detailed above.  However, this was not just a typical filling.  During the quarter, the Company made significant changes in its accounting methods.  With respect to the its accounting changes, the Company stated:

> Changes in Accounting Estimate
>
> Effective July 1, 2001, the Company revised its estimated lives for certain depreciable assets that resulted in a $4.6 million reduction in depreciation expense for the three months ended September 30, 2001. The estimated lives of network switch equipment was increased from five to seven years, cell site towers from five to 10 years and related cell site equipment from five to seven years. The Company revised these estimates after considering the impact of certain upgrades to its network that management believes extends the useful lives of these assets.
>
> Effective July 1, 2001, the Company revised its estimated lives for deferred activation fee revenue and deferred activation expense in accordance with its internal policy of conducting this review annually in the third quarter. As a result of this review, the Company has revised the estimated customer life from 30 months to 15-24 months. This change resulted in an increase during the quarter in recognition of deferred activation revenue of

approximately $750,000 and an increase in recognition of deferred activation expense of approximately $750,000. The Company defers activation expense only to the extent of the deferred activation fee revenues. It is the Company's policy to defer both revenue for activation fees and the direct expense of acquiring the customer in equal amounts and amortize these amounts on a straight-line basis over the estimated customer life.

(Emphasis added).

45.     The changes in the Company's accounting methods:

(a)     allowed the Company to change the depreciation rate from five to seven years; this acts as a hedge against anticipated accelerating future expenses and helps the Company offset costs over a longer period of time, which is important if management believes they are about to experience an overall decline in total subscriptions and a decline in subscription growth; and

(b)     allowed the Company to more quickly recognize deferred customer revenues related to activation fees; this also allowed the Company to immediately offset operating cost, which is important if the Company does not believe their current customers will live up to expectations and complete their service contracts with the Company.

46.     The cumulative effect of these accounting changes was further explained in the Company's Form 10-Q filed with the SEC on February 1, 2002:

Operating loss

The operating loss was $12.0 million for the three-month period ended September 30, 2001 as compared to $17.3 million for the three-month period ended September 30, 2000, representing a decrease of $5.3 million. The operating loss for the three-month period ended September 30, 2001 was reduced by a change in accounting estimate effective July 2001 that increased the useful lives of certain capitalized assets and reduced depreciation expense by $4.6 million.

(Emphasis added).

18

47.    It should be noted that during the third quarter, as the Company initiated these accounting changes to help offset losses in the short term, defendant Henning sold a considerable amount of his personal holdings in US Unwired.  (See Exhibit "A.")

48.    US Unwired ended the year on a high note.  On December 20, 2001, the Company announced in a press release that it had entered into a definitive merger agreement with IWO Holdings, Inc. ("IWO Holdings") another Sprint PCS affiliate.   Under the terms of the agreement, US Unwired would acquire all of the outstanding shares of IWO Holdings and would issue approximately 45.9 million shares common stock with an aggregate market value of $459 million.  This value was based on US Unwired's closing stock price of $10.00 on December 19, 2001.

49.    The shopping spree continued early in 2002.  On February 11, 2002, US Unwired announced in a press release that it had signed a definitive agreement to acquire another Sprint PCS affiliate, Georgia PCS Management, L.L.C. ("Georgia PCS").  At the time, the transaction was valued at approximately $90.4 million.  Under the terms of the agreement, US Unwired would issue 5.5 million shares of class A common stock.  This value was based on US Unwired's closing stock price of $6.49 on February 8, 2002, the shares had an aggregate market value of $35.7 million.

50.    On March 5, 2002, US Unwired announced in a press release its fourth quarter and year-end results for the period ended December 31, 2001.  The Company reported that revenues for the fourth quarter had increased to $81.2 million, up $9.9 million over the third quarter of 2001.  Revenue for the full year 2001 was $259.2 million.  This represented a 129% improvement over 2000.

51.   Also on March 5, 2002, US Unwired filed with the SEC its Form 10-K Annual Report for 2001.  The Form 10-K was signed by defendants Piper, Vaughn, and Henning and reiterated its financial results for its fiscal year 2001.

52.   On March 15, 2002, US Unwired announced, in a press release, that it had completed the acquisition of Georgia PCS.  In the process, US Unwired issued 5,395,615 shares of class A common stock and repaid $55.0 million of Georgia PCS' indebtedness.

53.   On April 2, 2002, US Unwired announced that it had completed the acquisition of IWO Holdings.  Under the terms of the transaction, US Unwired issued approximately 39.0 million shares of US Unwired common stock to the shareholders of IWO Holdings and had reserved approximately 6.9 million additional shares for issuance upon the exercise of IWO Holdings options and warrants.  As a result of the transaction, IWO Holdings was now wholly owned by US Unwired's subsidiary, Louisiana Unwired, LLC.

54.   Shortly thereafter, the Company touted the merits of these recent acquisitions.  On May 9, 2002, US Unwired issued a press release announcing record revenue of $92.1 million for the first quarter, period ended March 31, 2002.  The press release stated in pertinent part:

> PCS subscribers increased 103% to 350,296 from the same quarter 2001. During the quarter, US Unwired completed the acquisition of Georgia PCS and on April 1, 2002, US Unwired completed the acquisition of IWO Holdings, Inc., a Sprint PCS Network Partner whose service territory includes portions of New York, New Hampshire, Vermont and Massachusetts. These transactions create a company with a combined service territory of 17.6 million people, network coverage of over 12.1 million people, and more than 550,000 total wireless subscribers.

Defendant Piper stated as follows:

> Our continued focus on operational excellence was clearly illustrated by outstanding performance during the first quarter. During this period, our operational achievements included gross subscriber additions that exceeded those of the holiday selling

20

> season, average revenue per subscriber that increased in the face of
> intensifying price pressure, and network performance that
> improved even as system minutes of use increased by 35%. Our
> enthusiasm for our newest properties has only intensified as we
> execute our plan to integrate the companies. The service territories
> of both IWO Holdings and Georgia PCS represent substantial
> potential for our company.

The press release went on to say:

> PCS operations generated $85.2 million in total revenue for the
> quarter, a 116% increase over the first quarter of 2001 and a 16%
> increase over the fourth quarter of 2001. PCS subscriber revenue
> and roaming revenue were $52.7 million and $27.8 million,
> respectively, for the first quarter of 2002 compared with $22.3
> million and $12.8 million, respectively, in the first quarter of 2001.
> Average monthly revenue per PCS subscriber (ARPU), including
> roaming, was $87 for the quarter, a $9 increase over that of the
> first quarter last year.

55.    Also on May 9, 2002, US Unwired filed with the SEC its Form 10-Q for the

period ended March 31, 2002. The Form 10-Q was signed by defendant Vaughn, and reiterated

the financial results distributed by the Company in the May 9, 2002 press release described

above.

56.    The statements contained in ¶¶ 26-55 were each materially false and misleading

when made because they failed to disclose and/or misrepresented the following adverse facts,

among others: (1) the Company was increasing its subscriber base by signing up high credit risk

customers; (2) that accounting changes implemented by the Company were done in order to

conceal the Company's declining revenues; (3) that the Company had been experiencing high

involuntary disconnections related to its high credit risk customers; (4) that the Company

experienced lower subscription growth as a result of its policy that required credit-challenged

customers to pay substantial deposits upon the initiation of services; and (5) that the Company

21

was engaged in a dispute with Sprint PCS regarding its business relationship with Sprint PCS and Sprint PCS was pressuring the Company.

## The Truth Begins To Emerge

57.     On August 13, 2002, US Unwired announced in a press release the financial results for the second quarter, period ended June 30, 2002.  Initially, the Company highlighted its return to positive EBITDA.  However, defendant Piper went on to say:

> Historically, demand for new wireless services has been weak in our markets during the second quarter.  This year, that softness was compounded as we curtailed demand by requiring a deposit from credit-challenged customers in our southern markets and experienced high involuntary disconnects in our sub-prime credit classes.
> (Emphasis added).

58.     Additionally in the Company's Form 10-K, filed with the SEC on August 13, 2002, the Company stated: "Churn was 3.4% for the three-month period ended June 30, 2002 as compared to 2.2% for the three-month period ended June 30, 2001.  The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment."

59.     In response to this string of negative announcements, on August 13, 2002, the price of US Unwired common stock closed at $.90 per share, down 94.8 % from its Class Period high of $17.25 per share.

## Undisclosed Adverse Information

60.     The market for US Unwired's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, US Unwired's common stock traded at artificially inflated prices during the

22

Class Period. Plaintiff and other members of the Class purchased or otherwise acquired US Unwired common stock relying upon the integrity of the market price of US Unwired's common stock and market information relating to US Unwired, and have been damaged thereby.

61. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of US Unwired's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

62. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about US Unwired's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of US Unwired and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

63. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding US Unwired, their control over, and/or receipt and/or modification of US Unwired's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning US Unwired, participated in the fraudulent scheme alleged herein.

64.    Defendants were further motivated to engage in the fraudulent scheme alleged herein in order to enable the Individual Defendants and other US Unwired insiders to sell their personally held US Unwired common stock to the unsuspecting public at artificially inflated prices and while they were in possession of material non public information about the Company (See Exhibit "A.")  Moreover, because of the Company's class period stock offerings, the Company reaped millions of dollars in profits and therefore had an incentive to keep its stock price artificially inflated.

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

65.    At all relevant times, the market for US Unwired's common stock was an efficient market for the following reasons, among others:

(a)    US Unwired's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, US Unwired filed periodic public reports with the SEC and the NASDAQ;

24

(c)     US Unwired regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     US Unwired was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

66.     As a result of the foregoing, the market for US Unwired's common stock promptly digested current information regarding US Unwired from all publicly-available sources and reflected such information in US Unwired's stock price.  Under these circumstances, all purchasers of US Unwired's common stock during the Class Period suffered similar injury through their purchase of US Unwired's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

67.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of US Unwired who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated thereunder against all Defendants

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase US Unwired's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

70.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for US Unwired's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of US Unwired as specified herein.

72.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of US Unwired's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about US Unwired and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of US Unwired common stock during the Class Period.

73.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (I) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing US Unwired's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of US Unwired's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of US Unwired's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed

in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired US Unwired common stock during the Class Period at artificially high prices and were damaged thereby.

76.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that US Unwired was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their US Unwired common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

77.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act against the Individual Defendants

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of US Unwired within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

82.    As set forth above, US Unwired and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff counsel as Lead Counsel;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

101.    Plaintiff hereby demand a trial by jury.

Dated:                                    **KAHN GAUTHIER LAW GROUP, LLC**

                                          By: _____
                                          Lewis S. Kahn, Esquire (#23805)
                                          One Galleria Blvd, Suite 1726
                                          Metairie, LA 70001
                                          (504)455-1400

                                          **SCHIFFRIN & BARROWAY, LLP**
                                          Marc A. Topaz
                                          Richard A. Maniskas
                                          Three Bala Plaza East
                                          Suite 400
                                          Bala Cynwyd, PA  19004
                                          (610) 667-7706

                                          **LERACH COUGHLIN STOIA**
                                          **GELLER RUDMAN & ROBBINS LLP**
                                          William S. Lerach
                                          Darren J. Robbins
                                          401 B Street, Suite 1700
                                          San Diego, CA 92101
                                          Telephone: 619/231-1058
                                          619/231-7423 (fax)
                                          – and –
                                          Samuel H. Rudman
                                          David A. Rosenfeld
                                          200 Broadhollow Road, Suite 406
                                          Melville, NY 11747
                                          Telephone: 631/367-7100
                                          631/367-1173 (fax)
                                          **Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, (print name) _CLODILE ROMERO, JR_ ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the Complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary

4. Plaintiff's transaction(s) in the US Unwired, Inc. (Nasdaq: UNWR) security that is the subject of this action during the Class Period is/are as follows[1]:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 100 | BUY | I 30 | 11.00 |
| | | | |
| | | | |
| | | | |

[1]List additional transactions on a separate sheet of paper, if necessary.

5. Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring a suit to recover for investment losses.

6. During the three years prior to the date of this Certification. Plaintiff has sought to serve or served as a representative party on a class, in the following actions filed under the federal securities laws (if none, so indicate): _____

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _12_ day of _AUGUST_ 200_4_

_____
Signature

_CLODILE ROMERO, JR_
Print Name

## US UNWIRED, INC. (NASDAQ: UNWR)

### CLASS PERIOD MAY 23, 2000 TO AUGUST 13, 2002

| DEFENDANT | DATE | NUMBER OF SHARES | PRICE | PROCEEDS | TOTAL PROCEEDS |
|---|---|---|---|---|---|
| William L. Henning Jr. | 06/05/01 | 2000 | 8.21 | 16,420.00 | |
| | 06/06/01 | 2000 | 8.15 | 16,300.00 | |
| | 06/07/01 | 2000 | 8.00 | 16,000.00 | |
| | 06/08/01 | 1000 | 7.84 | 7,840.00 | |
| | 06/08/01 | 2000 | 8.06 | 16,120.00 | |
| | 06/11/01 | 2000 | 8.28 | 16,560.00 | |
| | 06/12/01 | 2000 | 8.20 | 16,400.00 | |
| | 06/13/01 | 2000 | 8.11 | 16,220.00 | |
| | 06/14/01 | 2000 | 8.15 | 16,300.00 | |
| | 06/15/01 | 2000 | 8.25 | 16,500.00 | |
| | 06/18/01 | 2000 | 8.35 | 16,700.00 | |
| | 06/19/01 | 2000 | 8.52 | 17,040.00 | |
| | 06/20/01 | 1000 | 7.75 | 7,750.00 | |
| | 06/20/01 | 2000 | 8.01 | 16,020.00 | |
| | 06/21/01 | 2000 | 8.30 | 16,600.00 | |
| | 06/22/01 | 2000 | 8.62 | 17,240.00 | |
| | 06/25/01 | 2000 | 8.85 | 17,700.00 | |
| | 06/26/01 | 2000 | 8.80 | 17,600.00 | |
| | 06/26/01 | 2000 | 9.05 | 18,100.00 | |
| | 06/27/01 | 1000 | 10.12 | 10,120.00 | |
| | 06/27/01 | 2000 | 9.50 | 19,000.00 | |
| | 06/28/01 | 3000 | 9.58 | 28,740.00 | |
| | 06/29/01 | 4000 | 10.01 | 40,040.00 | |
| | 07/02/01 | 4000 | 10.13 | 40,520.00 | |
| | 07/03/01 | 3000 | 9.83 | 29,490.00 | |
| | 07/05/01 | 3000 | 9.66 | 28,980.00 | |
| | 07/06/01 | 3000 | 9.66 | 28,980.00 | |
| | 07/09/01 | 4000 | 9.90 | 39,600.00 | |
| | 07/10/01 | 4000 | 10.70 | 42,800.00 | |
| | 07/11/01 | 3000 | 9.55 | 28,650.00 | |
| Total Page 1 | | | | | $645,830.00 |

## US UNWIRED, INC. (NASDAQ: UNWR)

### CLASS PERIOD MAY 23, 2000 TO AUGUST 13, 2002

| DEFENDANT | DATE | NUMBER OF SHARES | PRICE | PROCEEDS | TOTAL PROCEEDS |
|---|---|---|---|---|---|
| William L. Henning Jr. | 07/12/01 | 4000 | 9.89 | 39,560.00 | |
| | 07/13/01 | 4000 | 10.01 | 40,040.00 | |
| | 07/16/01 | 4000 | 10.53 | 42,120.00 | |
| | 07/17/01 | 4000 | 10.51 | 42,040.00 | |
| | 07/18/01 | 4000 | 10.48 | 41,920.00 | |
| | 07/19/01 | 4000 | 10.26 | 41,040.00 | |
| | 07/20/01 | 4000 | 9.90 | 39,600.00 | |
| | 07/23/01 | 4000 | 10.43 | 41,720.00 | |
| | 07/24/01 | 4000 | 10.15 | 40,600.00 | |
| | 07/25/01 | 4000 | 10.06 | 40,240.00 | |
| | 07/26/01 | 4000 | 10.23 | 40,920.00 | |
| | 07/27/01 | 4000 | 10.25 | 41,000.00 | |
| | 07/30/01 | 4000 | 9.94 | 39,760.00 | |
| | 07/31/01 | 4000 | 10.28 | 41,120.00 | |
| | 08/01/01 | 4000 | 10.44 | 41,760.00 | |
| | 08/02/01 | 4000 | 10.19 | 40,760.00 | |
| | 08/03/01 | 4000 | 10.21 | 40,840.00 | |
| | 08/06/01 | 4000 | 10.20 | 40,800.00 | |
| | 08/07/01 | 4000 | 10.27 | 41,080.00 | |
| | 08/08/01 | 4000 | 10.25 | 41,000.00 | |
| | 08/09/01 | 4000 | 10.64 | 42,560.00 | |
| | 08/10/01 | 4000 | 10.75 | 43,000.00 | |
| | 08/13/01 | 4000 | 10.71 | 42,840.00 | |
| | 08/14/01 | 4000 | 10.80 | 43,200.00 | |
| | 08/15/01 | 4000 | 10.84 | 43,360.00 | |
| | 08/16/01 | 3450 | 10.82 | 37,329.00 | |
| | 08/22/01 | 4000 | 10.93 | 43,720.00 | |
| | 08/23/01 | 4000 | 10.29 | 41,160.00 | |
| | 08/24/01 | 3000 | 9.73 | 29,190.00 | |
| | 08/27/01 | 3000 | 9.39 | 28,170.00 | |
| | 08/28/01 | 3000 | 9.77 | 29,310.00 | |
| | 08/29/01 | 4000 | 9.74 | 38,960.00 | |
| | 08/30/01 | 4000 | 10.26 | 41,040.00 | |
| | 08/31/01 | 4000 | 10.80 | 43,200.00 | |
| | 09/04/01 | 4000 | 11.04 | 44,160.00 | |
| Total Page 2 | | | | | $1,409,119.00 |

| DEFENDANT | DATE | NUMBER OF SHARES | PRICE | PROCEEDS | TOTAL PROCEEDS |
|---|---|---|---|---|---|
| US UNWIRED, INC. (NASDAQ: UNWR) | CLASS PERIOD MAY 23, 2000 TO AUGUST 13, 2002 | | | | |

US UNWIRED, INC. (NASDAQ: UNWR)   CLASS PERIOD MAY 23, 2000 TO AUGUST 13, 2002

| DEFENDANT | DATE | NUMBER OF SHARES | PRICE | PROCEEDS | TOTAL PROCEEDS |
|---|---|---|---|---|---|
| William L. Henning Jr. | 09/05/01 | 4000 | 10.52 | 42,080.00 | |
| | 09/06/01 | 3000 | 9.91 | 29,730.00 | |
| | 09/07/01 | 4000 | 9.89 | 39,560.00 | |
| | 09/10/01 | 3000 | 9.54 | 28,620.00 | |
| | 09/17/01 | 3000 | 9.14 | 27,420.00 | |
| | 09/18/01 | 3000 | 9.69 | 29,070.00 | |
| | 09/19/01 | 3000 | 9.75 | 29,250.00 | |
| | 09/20/01 | 3000 | 9.83 | 29,490.00 | |
| | 09/21/01 | 3000 | 9.17 | 27,510.00 | |
| | 09/24/01 | 3000 | 9.46 | 28,380.00 | |
| | 09/25/01 | 4000 | 9.78 | 39,120.00 | |
| | 09/26/01 | 3500 | 10.35 | 36,225.00 | |
| | 09/27/01 | 4000 | 9.60 | 38,400.00 | |
| | 09/28/01 | 4000 | 10.02 | 40,080.00 | |
| | 10/01/01 | 4000 | 9.94 | 39,760.00 | |
| | 10/02/01 | 4000 | 9.97 | 39,880.00 | |
| | 10/03/01 | 4000 | 10.29 | 41,160.00 | |
| | 10/04/01 | 4000 | 10.72 | 42,880.00 | |
| | 10/05/01 | 4000 | 10.61 | 42,440.00 | |
| | 10/08/01 | 4000 | 10.48 | 41,920.00 | |
| | 10/09/01 | 4000 | 10.39 | 41,560.00 | |
| | 10/10/01 | 4000 | 10.96 | 43,840.00 | |
| | 10/11/01 | 4000 | 11.75 | 47,000.00 | |
| | 10/12/01 | 4000 | 12.21 | 48,840.00 | |
| | 10/15/01 | 4000 | 12.35 | 49,400.00 | |
| | 10/16/01 | 4000 | 13.11 | 52,440.00 | |
| | 10/17/01 | 4000 | 13.17 | 52,680.00 | |
| | 10/18/01 | 4000 | 13.07 | 52,280.00 | |
| | 10/19/01 | 4000 | 12.39 | 49,560.00 | |
| | 10/22/01 | 4000 | 12.35 | 49,400.00 | |
| | 10/23/01 | 4000 | 12.07 | 48,280.00 | |
| | 10/24/01 | 4000 | 11.82 | 47,280.00 | |
| | 10/25/01 | 4000 | 11.98 | 47,920.00 | |

Total Page 3

| DEFENDANT | DATE | NUMBER OF SHARES | PRICE | PROCEEDS | TOTAL PROCEEDS |
|---|---|---|---|---|---|
| William L. Henning Jr. | 10/26/01 | 4000 | 12.54 | 50,160.00 | |
| | 10/29/01 | 4000 | 12.24 | 48,960.00 | |

$1,343,455.00

Total Page 4

TOTALS

| | TOTAL SHARES SOLD | | TOTAL PROCEEDS | |
|---|---|---|---|---|
| 10/30/01 | 4000 | 11.94 | 47,760.00 | |
| 10/31/01 | 4000 | 12.19 | 48,760.00 | |
| 11/19/01 | 3000 | 11.67 | 35,010.00 | |
| 11/20/01 | 3000 | 11.55 | 34,650.00 | |
| 11/21/01 | 500 | 10.52 | 5,260.00 | |
| 11/23/01 | 500 | 10.63 | 5,315.00 | |
| 11/26/01 | 500 | 10.69 | 5,345.00 | |
| 11/27/01 | 500 | 10.44 | 5,220.00 | |
| 05/01/02 | 250 | 6.30 | 1,575.00 | |
| 05/02/02 | 250 | 6.49 | 1,622.50 | |
| 05/03/02 | 250 | 6.39 | 1,597.50 | |
| 05/06/02 | 250 | 6.12 | 1,530.00 | |
| 05/07/02 | 250 | 6.38 | 1,595.00 | |
| 05/08/02 | 250 | 6.78 | 1,695.00 | |
| 05/09/02 | 250 | 6.75 | 1,687.50 | |
| 05/10/02 | 750 | 7.10 | 5,325.00 | |
| 05/13/02 | 250 | 6.37 | 1,592.50 | |
| 05/14/02 | 250 | 6.00 | 1,500.00 | |
| 05/15/02 | 250 | 6.00 | 1,500.00 | |
| 05/16/02 | 250 | 6.00 | 1,500.00 | |
| 05/17/02 | 250 | 6.18 | 1,545.00 | |
| 05/20/02 | 100 | 5.95 | 595.00 | |
| 05/21/02 | 100 | 5.42 | 542.00 | |
| 05/22/02 | 100 | 5.70 | 570.00 | |
| 05/23/02 | 100 | 5.22 | 522.00 | |
| 05/24/02 | 100 | 5.51 | 551.00 | |
| 05/30/02 | 100 | 5.18 | 518.00 | |
| 05/31/02 | 100 | 5.34 | 534.00 | |
| 06/03/02 | 100 | 5.13 | 513.00 | |
| 06/04/02 | 100 | 5.31 | 531.00 | |
| | 359,600 | | $315,581.00 | $3,713,985.00 |